Pro Se 7 (Rev. 09/16) Complaint for Employment Discrimination

FILED 2301 09 AM10 24 HIGH ALS

# UNITED STATES DISTRICT COURT
for the

**MIDDLE** District of **GEORGIA**

**Appendix D**

| | |
|---|---|
| **Jim Lewis** | Case No. **1:23-CV-8** |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |
| -v- | Jury Trial: *(check one)* ☒ Yes ☐ No |
| **Lowe's Home Centers, LLC.** | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Jim Lewis |
| Street Address | 638 GA Hiway 49 South |
| City and County | Americus, Sumter |
| State and Zip Code | Georgia, 31719 |
| Telephone Number | 770-222-2929 |
| E-mail Address | jimplus2@gmail.com |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

| | |
|---|---|
| Defendant No. 1 | |
| Name | Lowe's Home Centers, L.L.C. |
| Job or Title *(if known)* | |

Pro Se 7 (Rev. 09/16) Complaint for Employment Discrimination

|  | |
|---|---|
| Street Address | 1000 Lowe's Blvd. |
| City and County | Mooresville, Iredell |
| State and Zip Code | North Carolina, 28117 |
| Telephone Number | 800-445-6937 |
| E-mail Address *(if known)* | dfri@lowes.com |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Lowe's Home Improvement |
| Street Address | 1700 E. Lamar St. |
| City and County | Americus, Sumter |
| State and Zip Code | Georgia, 31709 |
| Telephone Number | 229-928-8167 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:


## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.
☑    Termination of my employment.
☐    Failure to promote me.

Pro Se 7 (Rev. 09/16) Complaint for Employment Discrimination

☐    Failure to accommodate my disability.

☐    Unequal terms and conditions of my employment.

☑    Retaliation.

☐    Other acts *(specify)*:    harrassment, retaliation, intentional infliction of emotional distress, fraud, toxic workplace, threats.

     *(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

     July 25, 2020 – April 16, 2022

C.    I believe that defendant(s) *(check one)*:

☐    is/are still committing these acts against me.

☑    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race

☑    color

☐    gender/sex

☐    religion

☐    national origin

☐    age *(year of birth)*      *(only when asserting a claim of age discrimination.)*

☐    disability or perceived disability *(specify disability)*

E.    The facts of my case are as follows. Attach additional pages if needed.

See attached complaint

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

33

## IV.    Exhaustion of Federal Administrative Remedies

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

<u>September 30, 2022</u>

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☑    issued a Notice of Right to Sue letter, which I received on *(date)*    <u>10-13-22</u>    .
*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

SEE ATTACHED COMPLAINT

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

34

Pro Se 7 (Rev. 09/16) Complaint for Employment Discrimination

A.  **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          1-9-23

Signature of Plaintiff

Printed Name of Plaintiff          Jim Lewis

B.  **For Attorneys**

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

35

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Atlanta District Office
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 10/12/2022

**To:** Jim Lewis
PO Box 91
AMERICUS, GA 31709
Charge No: 410-2022-09519

EEOC Representative and email:    Paul Chung
Systemic Investigator
paul.chung@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2022-09519.

On behalf of the Commission,

Digitally Signed By:Darrell Graham
10/12/2022

Darrell Graham
District Director

**Cc:**
Keisha  Tuck
1000 LOWES BLVD MAILCODE: LGL
Mooresville, NC 28117

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 410-2022-09519 to the District Director at Darrell Graham, 100 Alabama Street, SW Suite 4R30

Atlanta, GA 30303.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

## JURISDICTION AND VENUE

1.      Defendant Lowe's Home Centers, L.L.C. is an international company authorized to
conduct business in Georgia. The venue is proper in this Court because Plaintiff resides
in this district, and Defendant's business (store 2674) is there also.

## NATURE OF THE CASE

2.      Jim Lewis is the Plaintiff. Lowe's Home Centers, LLC. is the Defendant.

3.      Plaintiff was employed by Defendant from July 25, 2020, till April 16, 2022.

4.      Lowe's Home Centers, L.L.C. (also known as Lowe's in this document), a home-
goods retailer headquartered in Mooresville, N.C., has allowed in its single Americus,
Georgia store a dangerous, toxic workplace to develop, exist, and become the norm for
years. This situation is a result of the behaviors of management and employees consistent
with racial prejudice, racial discrimination, federal and state work/employment law
violations, retaliation against employees by store managers and assistant managers,
harassment of employees by store managers and assistant managers, intentional infliction
of emotional distress upon Plaintiff (who is white) by black assistant store managers,
known but unaddressed by management of all level threats of physical harm to Plaintiff
by fellow employees and customers, systematic lies to and about Plaintiff by store
managers and/or assistant managers, a repeated and consistent and in full knowledge
practice of Lowe's corporate policy violations by store managers and assistant managers,
district managers, and corporate H.R. managers, negligence by store managers and
assistant managers, district managers, and corporate H.R. managers, and fraud by store
managers and assistant managers.

5.      Lowe's Home Centers, L.L.C. has allowed these situations to develop, exist, and
persist in this store despite numerous pleas by Plaintiff and multiple other employees,
past and present, to store managers, assistant managers, district managers, and corporate
H.R. managers. Customers also complained to store managers and Lowe's corporate
about the negative black against white racial attitude that prevailed in the store.

1

6.     Furthermore, the two store managers (referred to in this document as store manager one and store manager two as it relates to their chronological dates of employment) who presided during Plaintiff's employment, the district store manager, the district Pro Sales Specialist manager, and the corporate H.R. manager were not only aware of all the issues mentioned above but ignored and enabled and participated in some of them.

7.     As a result of these activities and conditions, as well as those described below, the refusal of black assistant managers to provide documentation confirming Plaintiff's complaints about these matters and the refusal of black assistant managers to allow Plaintiff (who is white) to have a witness of his choosing during the many "harassment meetings" these assistant managers called him into, even though Lowe's management had sync-ups, H.R. complaints, e-cards, evaluations, write-ups, and witnesses to protect them, and the inaction of the store, district, and corporate level management after Plaintiff and others reported these issues, Plaintiff amassed an extensive library of audio recordings, photos, and hundreds of emails that provide confirming, irrefutable evidence of all his claims in this complaint.

8.     Plaintiff was well-liked by his customers and shared a great rapport with them.

9.     He was a good employee – very reliable, dependable, prompt, and performed exceptionally well under the circumstances in that particular department of that particular store.

10.     Plaintiff felt as though he liked most of and was liked by most of his fellow employees, both black and white.

11.     Plaintiff worked off the clock and without pay an additional 30 minutes every day for the first six months of his employment in full view and knowledge of all management and fellow employees, coming in early to be able to see how his department operated from the "get-go" daily, so he could better understand how the store operated in order to service his customers to the best of his ability.

12.     From the very first day of his employment at Lowe's, Plaintiff was subjected to racial and color discrimination and, merely weeks later into his employment, began to be harassed and retaliated against by store management and assistant store management as a result of asking for help with pulling/loading his orders.

2

13.      The Plaintiff was used as an unwitting pawn in an attempt by district and
corporate-level managers to garner information about the goings-on in a store with
known long-term and serious issues. He was placed in a very negative store situation that
had existed for years, with no backup, support, or assurance that he would receive any.
He was basically sacrificed for the information he unknowingly provided Lowe's
corporate via his emails. This situation ultimately resulted in his unwarranted termination
after many months of his simply trying to observe the ordinary and everyday rules and
procedures Lowe's expects from all its stores which in that store had been knowingly and
intentionally ignored and disregarded for years. He only came to realize this after
approximately a year of employment. This experience caused great emotional stress and
harm to Plaintiff.

14.      It is essential to note that the complaints in this document are entirely unrelated and
apart from situations that existed worldwide due to the Covid pandemic, the Black Lives
Matter Movement, or the Me Too Movement.  The situations resulting in the complaints
contained herein were not caused or exacerbated by this phenomenon but existed long
prior to, throughout, and since to this very day.

## RACISM

15.      The racist environment in this store was not the type most often heard about these
days in the news, white against black, but quite the opposite – black against white, and it
was/is perpetrated by the primarily all-black assistant management team of this store. It
was so bad that black employees would joke about it in everyday conversation in the
store. One black manager would even refer to white employees as "crackers," with no
regard whatsoever as to who heard him do so.

16.      The very C.E.O. himself of this international company has recently publicly stated
his desire for his white employees to "decolonize their minds" and "be willing to cede
power" to black people.

17.      A few days after hiring, store manager number one asked Plaintiff to see the
assistant manager responsible for shipping/receiving to order his Pro Sales business
cards. Plaintiff had never seen, spoken, or interacted with this person before that day. He

3

arrived at her workspace, knocked on the open door, introduced himself, and said why he was there. The black assistant store manager, sitting at one of the computers in the shipping/receiving office simply said have a seat. Plaintiff sat in a chair next to the assistant store manager for approximately 10-15 minutes as the process of creating/designing his cards was completed. The Plaintiff and assistant store manager were the only two people in that office the entire time. Not once during this entire process, as the Plaintiff sat 10-12" away from the assistant store manager, did she say anything even remotely similar to welcome aboard, or glad to have you or you are going to like it here. As a matter of fact, not even a single time did the assistant store manager even look at the Plaintiff – not once. The assistant store manager's only words during this encounter were the absolute bare minimum necessary to complete the task at hand.

18.     After a disagreement with a black employee regarding the best loading technique for a delivery of his, a black manager allowed that black employee to walk around the Plaintiff in circles with clenched fists, saying in a threatening tone, "Come on. You know you want to hit me, you know you want to cuss me, come on do it!" As this was happening, Plaintiff, ignoring and not responding to the taunts, asked the manager observing the entire event if this was acceptable behavior at Lowes. The manager replied, "Well, you made him mad, Jim." Not one time did the black manager tell the black employee to stop or that his behavior was unacceptable. Plaintiff left without saying another word.

19.     Often functions such as food being provided to employees would happen, and Plaintiff and other white employees would not even be informed of this. When Plaintiff was made aware of the events occurring, he could walk by the break room, just as any other employee could, and see nothing but black employees in the break room.

20.     A black male employee, when asked to do something by a white female co-worker, asked a black female manager out loud for all to hear and with no apparent fear of repercussion, "Do I have to do what that white bitch says?" after the white co-worker had left.

21.     At about 3:30 on a Friday afternoon, while Plaintiff was working on an estimate, a black assistant manager came to the Pro Desk and asked Plaintiff to assist a customer with a phone payment. Looking up, Plaintiff recognized her as a new customer he had

4

waited on several times in the recent past. The black assistant store manager told Plaintiff
he would momentarily give him an item number for a fridge that was being brought up
and for him to add it to the customer's original phone order purchase. As Plaintiff
approached the customer and assistant store manager, he heard the customer tell the black
assistant store manager this is how you lose good customers, and she might start going to
the other place. She also stated she had recently nearly gotten into a yelling match with a
very rude "store manager" (she said that is how he identified himself) because he told her
we could not make phone sales. She told him Plaintiff did them all the time. The
customer was obviously very dissatisfied up to that point with that experience and stated
so several times to the assistant store manager. The assistant store manager told her that
that (no phone sales) was typically true unless a Pro Sales Specialist who knew you
completed the sale, and then the assistant store manager walked away without further
comment. He did not once apologize to the customer or acknowledge her complaint. He
did not say he would follow up and get back to her - nothing to that effect. He just left.

22.     Plaintiff asked the customer to describe the employee "manager" she was referring
to - she said he was a tall, black man who told her he was a manager. Plaintiff asked her
if he was slender and tended to tilt his head when talking to her. She said yes, that sounds
like the man. Knowing his negative experience with this black assistant store manager in
the past and the customers' description of this employee, Plaintiff finished assisting his
customer and then emailed this assistant store manager asking why he did what he did to
his customer.

23.     The very next morning, another black assistant store manager called Plaintiff into a
meeting with the black assistant store manager who had initially been rude to his
customer, and the only thing the first store manager was concerned about was "...how
bad Travis must have felt when he read that email at 5:30 at the morning?!" He never
asked the other manager if what the customer said was true, if it ever happened, or did he
recall anything about this situation. He chastised Plaintiff severely for writing the email.
The black assistant store manager said he was now "...worried that whenever that
customer comes into the store, they will look at [that employee] differently.

24.     Several weeks later, the customer was in the store talking with Plaintiff, and the
black assistant store manager whom she was complaining about and the one Plaintiff

5

assumed it was and wrote the email to walked by, and the customer said out of the blue, "That is the fella I was talking about."

25.     On two separate occasions, in the presence of management, a black male delivery driver threatened Plaintiff with physical violence and harm very graphically and vulgarly because his attempts to follow the precise orders given to him by district-level managers would have caused the delivery driver to have to pull deliveries. This employee was not "written up" or chastised for these offenses.

26.     In a meeting with Plaintiff and two black assistant store managers, Plaintiff was told that before he arrived at Lowe's, the [black] employees in the lumber department had been "abused and mistreated" by the [white] employees there. When Plaintiff said what do you mean, I don't understand exactly what you are trying to say, the assistant store manager repeated his claim that the [white] employees "abused and mistreated" the [black] employees in the lumber department, except this time he asked his fellow assistant store manager to confirm and he did so by shaking his head affirmatively.

27.     After Plaintiff approached him in the parking lot as they met returning from lunch and tried to talk to him about the inappropriate behavior of another black employee, a black assistant store manager berated and attempted to humiliate Plaintiff in the parking lot in full view of coming-and-going customers and employees.

28.     During a two-hour meeting with the Store District Manager and others, after confirming to the Plaintiff and three other assistant managers in the meeting that the Pro Sales District Manager's very explicit instructions to Plaintiff were exactly what he expected as well, the Store District Manager asked Plaintiff if there was anything else he could do to help him before he left and the Plaintiff replied yes, please have the store managers present in the meeting and any other relevant associates to make sure all the people who need to know about this new policy are indeed made aware of it. The Store District Manager said ok and told everyone in the room to make that happen.

29.     In this very same meeting, Plaintiff shared with the district manager and H.R. manager everything he had experienced since his first day working at this store, including and very specifically, the persistent, blatant, and overt black-against-white racism and prejudice. The district manager looked directly at the Plaintiff and said, "You don't think we're aware of the things you're telling us?" The district manager also reiterated the

6

corporate mantra that if it's not in an email, then at Lowe's, it didn't happen, but he went on to say do like he does, write the letter on your computer but don't send it, just delete it after you have written it.

30.     Plaintiff, throughout the next couple of weeks or so, asked several relevant managers (who should have been made aware of the outcome of the meeting), and each said they had never even heard of what he was talking about when he described the events and conversations occurring in the meeting.

31.     After one of the numerous inappropriate incidents with black employees, Plaintiff, seeing the store manager alone, approached the store manager in the bullpen (rear outside storage area) of the store and stated, "You know there is a problem in this store and you know what I'm talking about, right - racism?" Store manager one looked at Plaintiff and nodded in the affirmative, and Plaintiff said, "If you would just help me understand why this is allowed to happen, it would sure make it a lot easier to deal with." Store manager one replied, "I know, I can't tell you and you'll never know."

32.     Plaintiff was expecting a package from Accurate Estimates (a Lowe's vendor) regarding a customer's job, which the vendor said would be addressed to him personally. After not receiving the package promptly, Plaintiff called the vendor, who said the package had been delivered and received into the store. Plaintiff walked up to the meeting room and saw one black H.R. person and one black assistant manager talking in the room and asked them during a pause in their conversation if either of them knew where that package might be. The assistant manager completely ignored Plaintiff and walked out of the room, while the H.R. person sitting at her desk looked down at her screen and began typing without saying a word to Plaintiff. Plaintiff walked out of the room.

33.     A black customer became belligerent with Plaintiff over a matter of pricing (Plaintiff's co-worker, the only other Pro Sales Specialist in the store, had sold truckloads of drywall to a competitor re-seller in full knowledge of Lowe's store management) because Plaintiff would not price match the price the re-seller had offered that customer on that exact same material. The customer got in Plaintiff's face and was yelling, cursing, and threatening him, saying, among other things, that he knew where Plaintiff lived.

7

Plaintiff did not react or respond verbally to these threats but did not walk away, simply staring at the customer as he ranted.

34.     Plaintiff was written up for that offense by a black assistant store manager. Several weeks earlier, the same customer had been in the exact same kind of situation with a black assistant store manager cursing and yelling at him. The assistant store manager lunged at him and told him that if he cursed him again, he would "...punch him in the nose.", causing the Loss Prevention manager of the store to have to step in between the men to calm the situation. The black assistant store manager was not written up by the other black assistant store managers for that even more severe violation of Lowe's store policy.

## **RETALIATION**

35.     Early in Plaintiff's employment with Lowe's, in complete and unexpected surprise to him, the Pro Sales District manager appeared at the Pro Desk one day and asked to speak with Plaintiff and the assistant manager over his department. When both parties were present, he pointed his finger directly at the Plaintiff and said, "You do not pull orders." He then pointed his finger directly at the assistant manager and said, "You pull orders." Much to Plaintiff's surprise, because he had been stating all along to his managers that he needed help with his orders pulling, Plaintiff asked the Pro Sales District manager if he could repeat that directive, to which he replied yes. He then once again pointed his finger directly at Plaintiff and said, "You do not pull orders." He then pointed his finger directly at the assistant manager and said, "You pull orders."

36.     He then looked directly again at Plaintiff and said, "And if anybody gives you a hard time about this, show them this." and pointed at a nearby computer screen on which he had displayed Lowe's Corporate Policies for Pro Sales Specialist, which stated in bold, black, letters "Pro Sales Specialists Do Not Pull Orders." He then went on to say kind of out of the blue, "At Lowe's, if it isn't in an email, it didn't happen."

37.     Soon after that, at a meeting with the Plaintiff, District Store Manager, Corporate HR Manager, and three members of store management, the District Manager assured the Plaintiff as well as all the other managers present in that room (in addition to calling in

8

the assistant manager responsible for deliveries to make sure he was aware of this as well), he fully agreed with and supported the instructions issued by the Pro Sales Manager and fully expected them to be followed by all employees in that store. The district manager also gave very specific instructions to all the parties in the room at that time that all persons in Lowes who needed to be aware of these instructions should be promptly made aware. The district manager then also advised the assistant store manager to, in his presence, look up allowable codes for Pro Sales Specialists and, upon verification of his assumption, have the Plaintiff's employee card coded a certain way. She said she would see to that but never did that.

38.     Importantly, from that time forward till the very day of his termination, at no time ever time did any District Store Manager, Pro Sales Manager, or Corporate H.R. manager provide to Plaintiff any instructions whatsoever to the contrary of, or to change, pause, or disregard those very specific instructions and Plaintiff abided by those rules till the very day of his termination.

39.     An assistant store manager told a cashier, "I think I'm going to write [Plaintiff] up. He's really pissed me off today." This happened after Plaintiff had banded and placed a bunk of 2x4x16 lumber in the rack using the white fiber bands. The assistant store manager obviously did not see the white bands, but once he approached Plaintiff about it, threatening a write-up, and Plaintiff walked him back to the lumber and showed him it was correctly banded, the assistant manager walked away without saying anything.

40.     Plaintiff repeatedly asked both store manager one, store manager two, as well as assistant managers, particularly the assistant manager responsible for deliveries, to simply email the District Manager who had issued the very clear, concise store policy directives for clarification when they completely and repeatedly refused to abide by the directives.

41.     When Plaintiff asked store manager two if he was aware of the two-hour meeting and what was discussed with the district level manager, corporate level H.R. manager, and several store managers, he replied, "Yes, I'm aware of it."

42.     Several days later, after store manager two would never acknowledge the very specific instructions issued by district-level management in that same meeting, Plaintiff again asked him what his position was on the matter. The store manager, trying to deflect, said I am the store manager. Plaintiff said, "No, John, what is your position as the store

9

manager on the meeting?" Finally, after much hem-hawing around, the store manager asked, "What do you want me to do, get clarification on what you are saying?" Plaintiff said, "Yes, that is exactly what I would like you to do, John."

43.      Shortly after that, Plaintiff was fired.

44.      Plaintiff asked direct, specific, and very valid questions verbally and via email to multiple members of management from the store manager down, as well as loss prevention personnel for assistance in servicing his customers, as well as regarding Lowes policies and procedures but was utterly ignored numerous times, in addition to locating missing merchandise. He would follow up those emails with additional ones asking someone to please provide advice or assistance in these matters, but he still was completely ignored. He specifically asked what the chain of command is. Who is responsible for scheduling deliveries? Who is in charge of pulling orders? This occurred on numerous occasions regarding multiple issues for many months.

45.      Before he was made responsible for pulling deliveries, an assistant store manager came to the Pro Desk one day and, during a conversation about what was happening in the department, told Plaintiff, "I've always known Pro Specialists were not supposed to pull orders." Plaintiff looked at him incredulously and said, "Oh great! Why haven't you said something before now?!" The assistant manager just laughed, mumbled something, and walked away.

46.      Plaintiff had an excellent customer order a hot water heater. Plaintiff processed the order, and the customer paid for it, the customer asked the shipping/receiving manager when he should tell her it would be delivered, and he told the customer that (the next morning). Plaintiff emailed the delivery info to the shipping/receiving manager. The next day came, and the delivery still needed to be made.

47.      Plaintiff's orders would not be pulled or delivered despite his providing proper paperwork, notice, and information to relevant employees. When Plaintiff stated to store manager number one he felt as though his assistant managers were ignoring his orders as a way of saying "screw you" for trying to follow company policy, store manager one looked at him and chuckled, saying, "Yeah?" and nothing else.  He did nothing, and the same pattern of these behaviors continued for months, even into the tenure of the second manager.

10

48.       Management would rarely if ever, open the bullpen gate when Plaintiff called for it
for sometimes up to twenty minutes. Occasionally they would never come at all. This
caused Plaintiff hardship in servicing his waiting customers and delayed his efforts to
have his deliveries go out. It would then be up to Plaintiff to try and explain to his
customers why their product could not be loaded or delivered. When management did
unlock the gate, it was usual and customary that they would unlock it and slide the gate
back as the person requesting the unlock was almost always sitting on a forklift with a
full load waiting to get out of the bullpen. Once, an assistant manager did eventually
come back to the bullpen after numerous calls and, after about twenty minutes and
walked past Plaintiff sitting on the forklift, unlocked the gate without opening it, walked
to the side of the forklift, leaned up against a stack of lumber and stared at Plaintiff.
Plaintiff looked at her in surprise for a few moments, finally asking her if she was going
to open the gate. She replied that she just had to unlock the gate, not open it.

49.       In a nutshell, Plaintiff attempted to follow the exact and specific instructions given
to him by no less than two district-level managers.

50.       Plaintiff was told by both the district manager and the Pro Sales district manager,
"At Lowe's, if it isn't in an email it didn't happen."

51.       An assistant store manager told a co-worker who worked closely with Plaintiff and
was his friend not to talk to him anymore because Plaintiff was spreading rumors about
her (the co-worker) – which was utterly false. The manager was simply angry with
Plaintiff for non-related issues.

52.       After his termination, Lowe's denied Plaintiff his unemployment benefits, and even
though he appealed the decision, he is still waiting for a hearing to this day.

53.       The Pro Desk C.S.A. employee would frequently make negative comments about
Plaintiff to customers, other employees in the Americus Store, and employees in other
stores in the district.

54.       By chance, both parties returned from lunch at the same time, and Plaintiff
approached a black store manager in the parking lot to discuss ongoing racial issues with
a black employee. The black store manager, for 45 minutes, defended the black employee
on every point, saying, among other things, "…he is honest…". During this conversation,
the store manager raised his voice, waved his arms, displayed intense body language and

11

facial expressions, and disparaged Plaintiff in the middle of the Lowe's parking lot, in full view of customers and other employees alike. Store manager one stayed under the awning area, observing the entire event but never intervened.

55.     At three-thirty one afternoon, a very good, high-volume customer of Plaintiff came into the store to make a large purchase. Plaintiff walked through the store for two hours with the customer and his wife, selecting literally an entire house's worth of products they needed for a rental home renovation, the only condition to the purchase being it would be delivered the next day (this was during store manager one's tenure and prior to store managers twos no-next-day-delivery policy). Plaintiff took the paid order to two separate black store managers and showed them asking for help in pulling the order and getting it ready for next-day delivery. Both black assistant store managers said no, they could not help, nor have any other employees help Plaintiff as they were all busy. Plaintiff worked three hours overtime, pulling the order in its entirety completely by himself.

56.     One day while engrossed in preparing an estimate for a customer at his workspace desk, the black assistant store manager walked by the Pro Desk looking for the lumber cashier who had, unknown to Plaintiff, left her post. The assistant store manager said very loudly and rudely, "Where's Nece?" Not really paying attention to peripheral activity around him and assuming she was talking to someone else as she never, ever spoke to him, Plaintiff did not respond. The assistant store manager then repeated the question even louder and ruder, emphasizing each word, "I said, where is Nece?" Realizing then she was talking to Plaintiff, he looked up at her, surprised, and she was staring at him, and he replied in the same tone, "I do not know." She turned and left without saying a word.

57.     Several days later, this same black assistant store manager was at a register in appliances helping a black customer, who also happened to be a sweet, elderly lady. Another assistant store manager had told Plaintiff that this particular assistant store manager knew the details about an item to be delivered to a customer of Plaintiff, and he needed to locate the item. He walked up to the assistant store manager because she and the customer were not talking at that moment. The assistant store manager was looking at something on the computer, and the sweet, old lady was just waiting there. Plaintiff waited for the right moment, then asked the assistant store manager if she knew about this

12

situation. She looked up at him and very rudely, loudly, and in front of the customer said, "I am helping a customer!" The customer just stood there looking at him and smiled very sweetly at Plaintiff as he turned and left without saying another word.

58.     Plaintiff, along with a new C.S.A. (customer service associate), was pulling a very large order for one of Plaintiff's customers. It came to be four o'clock, and the current store manager had issued no-overtime orders recently. Plaintiff went and told the black assistant store manager about the situation and then returned and continued preparing the order. This black assistant store manager walked up at about four-thirty (Plaintiff's designated quit time) and asked, "Is this the big order you were talking about?" the Plaintiff said yes, it was, and the black assistant store manager turned and walked away without saying a word. Plaintiff came in the next morning, and absolutely nothing else had been done to prepare the order for delivery after he left.

## HARASSMENT

59.     When a district manager asked him at his desk, "What's the problem? Why can't you spend more time getting apps?" and Plaintiff replied, "Do you really want me to tell you?" store manager two standing next to the district manager rolled his eyes, looked directly at Plaintiff and with a smirk said, "Oh, here we go."

60.     Both store managers and several assistant store managers would consistently call for the Plaintiff, using his full first and last names to come to the manager's office over the store P.A. in a very stern, unfriendly voice over some minor issues during business hours in front of customers and fellow employees alike.

61.     Plaintiff was looking for inventory to fulfill an order and walked back to shipping/receiving. Needing to check the computer, he walked to the office door and attempted to enter. The door was locked, and the black shipping assistant manager was sitting in the office with the door locked, eating food and talking on her cell phone. She looked up and condescendingly, "Please, I'm having my lunch!" and then said Plaintiff would have to come back later, even though he told her he needed to use one of the computers to look for the product location. Plaintiff left and began looking for the product. Several minutes later, he was returning to the office to see if he could get in to

13

use the computer, and still out of sight of the office, overheard the shipping assistant manager saying to another employee, "…and he wanted to use my mother-fucking computer!" Plaintiff stepped around the boxes and said, "I didn't want to use your "mother-fucking" [air-quoting with his fingers the vulgar language] computer Rene, there's two in your office, and I just wanted to use one to check the location of this product!" She pointed with her index finger and said, "You can just go back up there!" "Plaintiff replied, "I'll go when I find this product." The shipping assistant store manager then filed within a day or two an H.R. complaint against Plaintiff.

62.     The shipping assistant manager called Plaintiff at the Pro Desk and asked him to come back to shipping/receiving, which he did promptly. When he arrived, the shipping assistant manager asked him to move a boxed hot water heater he had taken back there in preparation for next-day delivery on the box truck. The product was placed in the same area where he had been told to place previous items of that type by that same assistant manager before in preparation for box truck delivery. He asked where she would like him to move it, and she pointed and replied, "Over there," with over there being literally 10-12' from its current location, simply across the aisle way. Plaintiff asked if she was serious and if that was the reason she asked him to stop what he was doing at the Pro Desk and come move this item, which she could have easily done as she moved items like that daily, or she could have had another employee who worked in that department move it. She replied yes. Plaintiff moved the item in about four seconds and returned to his duties at the Pro Desk.

63.     After Plaintiff emailed a black assistant store manager about her behavior regarding his customer in the store, store manager one called Plaintiff into the meeting room and said, "Stop the emails. Please, stop the emails." Almost pleading.

64.     A black assistant store manager came down and did an override for Plaintiff for customer delivery. As Plaintiff was pulling up the order on his computer, the assistant manager picked up Plaintiff's personal clipboard and started thumbing through and reading the pages, oddly saying, "It's good to have a clipboard to write on." Plaintiff looked at him, took his clipboard, and set it back on his desk. The assistant store manager just laughed and walked away.

14

## THREATS

65.     Another black employee passed Plaintiff from the opposite direction as they each
rounded a corner and willfully and intentionally stuck out her elbow hitting Plaintiff in
the side. Plaintiff stopped, turned around, and looked at the black employee, not saying a
single word as the other employee said very loudly, almost in a yell, in front of many
customers, "Why you hit me?!" Without saying a single word, Plaintiff walked away and
immediately emailed management about the situation.

66.     To his knowledge, nothing was ever done about this situation as he overheard the
loss prevention man telling another employee that the camera could not see the specific
area of the store.

67.     This was not the first time this same employee assaulted Plaintiff in a very similar
manner. Plaintiff advised the management of both events.

68.     Two managers would harass Plaintiff in front of his customers and treat the
customers poorly as well. One customer of Plaintiff, after such an experience, called store
manager one outside and told him if that assistant store manager ever treated him like that
again, he was going to "...beat his ass!"

69.     Plaintiff would pull his orders, stage them, and notify all appropriate managers it
was ready to go and they would completely ignore his emails, and the order would not be
delivered.

70.     Plaintiff took a single piece of lumber out to the bullpen to add to a delivery for his
customer after his customer called and asked him to add it to the delivery, which he had
staged in the bullpen when the black delivery driver started his threats and comments
about Plaintiff. The black delivery driver did this in front of a black assistant manager.
Plaintiff said nothing to the black delivery driver but looked at the black assistant
manager for guidance.  The black assistant manager never said a single word to the black
delivery driver the entire time but held up the palm of his hand in a "stop" fashion in the
face of Plaintiff.  Plaintiff simply put the piece of lumber on the stack of staged lumber to
be delivered and walked away.

15

## **FRAUD**

71.     After completing his week of orientation in the Columbus, GA Lowe's store, Plaintiff was warned on his very first day of employment at store 2674 by the delivery driver (who had been employed there for several years at that time) that the only Pro Sales Specialist currently at that store (who had been employed at store 2674 for approximately seven years at that time) had been on a long-term basis, and was still currently stealing from the store by "overloading" his deliveries, and to be careful about how Plaintiff processed his deliveries in order to prevent becoming suspect of the same crimes.

72.     An assistant store manager told Plaintiff once that as a result of a particular large insulation transaction by the other Pro Sales Specialist, which was approved by store manager one, "Somebody should have been escorted out of this store in handcuffs for that one!"

73.     Months later, as Plaintiff walked through the store, he rounded a corner and passed by the other Pro Sales Specialist and the Store Asset Protection Manager engaged in a conversation. He did not stop, but as he passed by heard the Asset Protection Manager, with kind of a chuckle, ask the other Pro Sales Specialist if he "… had put a little something on top for himself?" regarding a recent delivery that had gone out. The Pro Sales Specialist looked up at the Asset Protection Manager and replied, "I'm just doing what my customer asked me to." That is all Plaintiff heard as he continued walking on.

74.     Months later, while assisting a very large-volume customer who generally dealt with the other Pro Sales Specialist, the customer asked the Plaintiff about a large toolbox in overhead storage. The Plaintiff asked the customer if he could pull down the toolbox for the customer, but the customer replied, "No thanks, I'll wait till I build up another large order, and I'll get that put on the top. The tax-man don't know about it, and Lowe's don't know about it and everyone's happy."

75.     Soon after that, an employee of another longtime, large-volume customer of the store whom the Store Asset Protection Manager stated numerous times was considered an absolute thief (his brother/partner had been previously banned by Lowe's corporate from the store for stealing) and was watched very closely by Asset Protection whenever he

16

came into the store, approached Plaintiff, pulled out what appeared to many bills out of his pocket, attempted to hand them to the Plaintiff, and offered him a bribe to let him take product from that store saying "That's how it's done here." Plaintiff, of course, refused the offering, replied you have the wrong guy, and the answer was no.

76.      Plaintiff told every manager of every level, including Asset Protection, about the incidents specified in the four previous paragraphs.

77.      Store Manager two personally told customers and repeatedly instructed Plaintiff, as well as two assistant managers repeatedly told Plaintiff to tell customers applying for a Lowe's credit card would not result in a "hard" inquiry on any of their credit reports due to the "different algorithm" Lowes uses to determine creditworthiness. Plaintiff disputed this assertion and clearly stated his strong disagreement with that statement more than once to more than one member of management. Each time each one told Plaintiff he was wrong, and that was the information to be provided to the customers. Plaintiff finally called Synovus bank, which provides Lowes credit accounts, and asked them point-blank about that issue. Synovus bank assured him very clearly, in no uncertain terms, that if a customer applies for a credit account, it would most definitely result in an inquiry on their credit reports. Plaintiff went to the manager's office and told him what he had learned. The manager mumbled something, turned his chair around to present his back to Plaintiff, and then basically began to ignore him and treat him disrespectfully when he did acknowledge him. Soon after, he filed an H.R. complaint against Plaintiff, stating he was rude and disrespectful to management.

78.      Store manager two was very specific with employees about never promising next-day delivery to customers, yet when a customer of Plaintiff came into the store one day when Plaintiff was not in, he told her if she would sign up for a credit card, he would provide her next day delivery for her purchase, which she then did so based upon that promise. She called Plaintiff the next afternoon, wondering where her delivery was. Plaintiff called store manager two and told him what the customer said, and he told Plaintiff he had never told her that.

79.      A very good, high volume, longtime customer asked Plaintiff one day about a promotion Lowe's was advertising in-store about an additional discount offered if customers opened a credit account. The promotion verbiage on the hanging sign seemed

17

vague and unclear. Even Plaintiff did not fully understand how it worked but was trying to help the customer understand exactly what he would receive if he opened an account when store manager number one walked by. Plaintiff asked the manager if he could assist, and the store manager stopped and spoke with the customer as the Plaintiff listened. He told the customer something that sounded like a Rubik's cube-esque, convoluted, ununderstandable answer. The customer chuckled, looked at him, and said ok, thanks, and goodbye as he walked away. Plaintiff questioned store manager one on the accuracy of his answer. Store manager one replied smiling, "Jim, sometimes you just gotta adlib!" Plaintiff asked if he meant to lie to a customer, and store manager one said, laughing, "I didn't say that; I said adlib!" and walked away.

80.     Just prior to store manager one's removal from his position at that store, an extensive, store-wide, comprehensive inventory audit was completed by Lowe's corporate, and it determined that a considerable percentage of inventory that was supposed to be present in that store was not, and could not be accounted for.

81.     When Plaintiff attempted to discuss concerning matters at the Pro Desk, store manager one started his response with, "Well, I inherited this from previous the previous store manager]."

82.     A customer of Plaintiff's ordered materials for a construction project on behalf of her employer, a nearby school district. Among the items were two interior doors. Due to a change of software used by Tennessee Millworks, Lowes door vendor, the order had to be refunded/rebilled just a day or so after the sale. As a result, a balance of just over five dollars became owed to the customer. Store Manager one said to put it on a store merchandise (merch) card (Lowe's gift card basically) and give it to the customer the next time she came in the store. Approximately seven months later, the doors arrived (one was defective, but the customer wanted it), and Plaintiff was arranging delivery. He discussed with an assistant manager the matter of getting the merch card to the customer as she said she was not coming to the store and was told by the assistant manager that he would mail it to her for him. Hence, Plaintiff gave the manager the merch card in a pre-addressed envelope (as the manager had stipulated) to do so. Several days later, Plaintiff checked with his customer and was told by her that she still needed to receive it. Plaintiff inquired of the assistant manager what had happened, and the assistant manager acted like he did

18

not know what he was talking about.  Plaintiff went to store manager two for guidance
and was ridiculed by store manager two in front of employees and customers alike in the
Customer Service area as he kept loudly saying, "Jim, it's five bucks. FIVE BUCKS!
Why are you making such a big deal about five bucks?!" over and over.

## INSUBORDINATION

83.     According to Lowes, the Plaintiff was fired for insubordination because he
supposedly told a supervisor, no, he would not do as he asked. That is not what happened.
If people were going to be fired at this store for insubordination, it should have been all
the management/supervisor team as they all completely, knowingly, willingly, and
repeatedly totally disregarded the very clear, concise, and explicit instructions given by
the district manager and H.R. Supervisor.

84.     When Plaintiff reminded store manager one about what the Pro Sales manager and
District Store Manger had told him regarding pulling orders and deliveries, he replied, "I
like Shane, but he doesn't understand retail."

85.     When Plaintiff asked store manager two if he was aware of the meeting with the
district manager and H.R. manager regarding the order pulling issue, he would always
skirt the issue and not give direct answers.

86.     On more than one occasion, Plaintiff made H.R. aware of all these issues.

87.     To his knowledge, to the very day he was terminated due to following their
instructions faithfully, no one from H.R. or District ever supported him in this matter
despite their orders.

88.     It is imperative to note that during the many months of conflict between Plaintiff
and management regarding the pulling and delivery of his orders, and the times he was
told he was not following instructions by management, was he ever even a single time
written up, or officially reprimanded in any way for that supposed infraction. Only when
the management team finally found an untrue, bogus claim did they have him fired for
the exact same thing the entire management team of that store had been blatantly and
utterly incorporating into their dealings with him for months – insubordination of direct

19

instructions from the district level manager, district level H.R., and the Pro Sales District
manager.

## EMOTIONAL DISTRESS

89.     Lowe's district management and corporate H.R. knowingly, intentionally, and with
great forethought used Plaintiff, a new, first-time Lowe's employee, as an unknowing
conduit to detailed knowledge of illegal and improper activities in this store with known
and established serious issues. These issues were acknowledged very clearly by the
district manager to Plaintiff early on in a meeting. Plaintiff was placed in situations with
vague instructions knowing it would be against the established undesired norm and
procedures in that store. As a result, this would cause him hardship and stress among his
managers and peers. As well, the district manager encouraged him to write email letters
venting his frustrations but not send them and then delete them. No other employees
were given such directions, particularly with such specificity. The district manager did
this so Lowe's corporate could monitor and resource the information provided in those
emails. After the meeting district manager would completely ignore Plaintiff when he
was in the store, looking completely away and/or ignoring him when they passed each
other in the store during the district manager's visits, they did this and never once backed
him up or came to his defense when situations arose, pitting him against store
management or fellow employees. He was left on his own without support of any kind.

90.     Both store managers Plaintiff worked under multiple times either told him point-
blank to stop emailing and/or asked him politely to stop emailing. When Plaintiff
reminded them of what district-level managers had told him to do and continued to email,
both managers began to completely and totally ignore Plaintiff's emails and
allowed/encouraged all other store employees to do so as well, despite two district-level
managers telling Plaintiff very specifically to email and that "At Lowe's, if it isn't in an
email it didn't happen!" Curiously enough, despite their many write-ups, sync-ups, H.R.
complaints, "meetings," and lectures regarding other frivolous and otherwise issues they
felt compelled to lodge against the Plaintiff, neither store manager nor any assistant

20

manager whatsoever ever even a single time "wrote-up," filed and H.R. complaint, or took any other disciplinary action whatsoever toward Plaintiff for emailing.

91.     Plaintiff had necessary and important eye surgery scheduled for the Thursday of the week he was terminated. Plaintiff's doctor advised him that this surgery was necessary and needed to be done basically immediately to prevent damage to his eyes. As a result of his termination, his insurance coverage ended on the day of his termination, causing Plaintiff to have to reschedule his surgery.

92.     As a result of the loss of coverage, Plaintiff's doctor canceled his surgery date and refunded his prepayments.

93.     The stress involved with arranging the surgery with a new doctor was great. Plaintiff's blood pressure has elevated dramatically since beginning his employment with Lowe's, and he is now required to take daily blood pressure medications for the first time in his life.

94.     Plaintiff told manager one upon his hiring; it was his hope to after retiring from a successful life-long career in the big city as a general contractor to retire to a small, quaint, friendly town, work "for someone else" for ten years, boosting his social security fund as well as a 401k, and really, truly retire at age 70. Plaintiff was genuinely qualified for, excited about, and looking forward to his new job at Lowe's, and he had much to offer with his decades of experience and expertise.

95.     They would be a perfect match made for each other under normal circumstances. Lowe's chose to ignore the problems in its ranks in lieu of profit and sacrifice.

## PRAYER FOR RELIEF

96.     Plaintiff has a cause of action against Lowe's Home Centers, L.L.C. for racial discrimination, harassment, intentional infliction of emotional distress resulting in harm, retaliation, fraud, toxic workplace environment, threats of violence, corporate malfeasance, and wrongful termination.

97.     Plaintiff has a cause of action against Lowe's Home Centers, L.L.C. for negligence and all other applicable theories of liability, negligent training, negligent supervision, and

retention of unsafe employee(s), respondeat sziperior, and all other applicable theories of liability.

98.     Plaintiff is entitled to recover from Defendant for his past and future medical expenses, lost wages, past and future pain and suffering, and all other damages permitted by law.

99.     Plaintiff respectfully demands a jury trial to decide on all issues triable as a right by a jury.

100.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court: A. Enter judgment for Jim Lewis and against Lowe's Home Centers, L.L.C., based on Defendant's willful violations; and B. Award Plaintiff Jim Lewis compensatory damages, including front pay, back pay, and lost benefits; and C. Award Plaintiffs damages, the costs of litigation and filing; and D. Grant such other and further equitable relief as this Court deems equitable and just and/or available pursuant to Federal Law, including punitive damages.

101.    Respectfully submitted this the 9th day of January 9, 2023 by Pro Se Plaintiff Jim Lewis, PO Box 91, Americus, Georgia 31709, P: (770) 222-2929,
Email: jimplus2@gmail.com in the U.S. District Court, 201 W. Broad Avenue, Albany, Georgia.

1-9-23